IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

OSWALDO NAVA,

    Plaintiff.

v.              No. **26-cv-02017**

SHAWN POWELL, JAMES JOHNSTON,
W. ANTHONY MAJOR JR., BENITO GONZALES,
STEPHANIE MILES, MARTHA STAAB and
ERIC MANN, in their individual capacities.

    Defendants.

## COMPLAINT FOR DAMAGES

Plaintiff states his complaint, allegations and causes of action as follows:

### I.  Introduction.

1. As of September 16, 2025, Plaintiff Oswaldo Nava was employed as a campus security guard at Eastern New Mexico University's Roswell, New Mexico campus. Plaintiff had been employed for six years, and had an excellent work record with no disciplinary action ever taken against him. Despite Plaintiff's unblemished work record, on or about September 16, 2025, Defendants placed Plaintiff on administrative leave, immediately removed him from his job duties, and constructively discharged him. These adverse actions were taken in violation of Defendants' own employment policies which required the use of progressive discipline and were taken against Plaintiff because of a posting he made on his private Facebook page shortly after the death of Charlie Kirk, an influential and highly controversial national Republican Party figure, on September 10, 2025. Plaintiff's posting, while perhaps insensitive to some supporters of Mr. Kirk, did not threaten anyone, urge or cause any type of violence or disruption on the campus or elsewhere, and was clearly protected by the First Amendment to the United States Constitution.

2.  The actions taken against Plaintiff by Defendants were not undertaken because of any actual disruption of or interference with Plaintiff's job performance or because of a reasonable belief his private comment might reasonably undermine, disrupt or impair the efficient functioning of the university security department.  Rather, Defendants viewed the content of the posting as "negative" and acted in response to an external, coordinated national political campaign organized by persons outside New Mexico.  This coordinated campaign was calculated to chill the speech of and punish public employees across the nation who were deemed political critics of or unsympathetic with Mr. Kirk, regardless of their competency at their jobs.  According to Reuters News Service, approximately **600** public employees across the country were subjected to some form of disciplinary action in retaliation for their speech about Mr. Kirk.  Plaintiff was one of these victims.

3.  Plaintiff brings this action for monetary damages pursuant to 42 U.S.C. §1983.

**II.    Parties and Jurisdiction.**

4.  Jurisdiction over the federal claims is proper under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §2000e-5(f)(3).  The claims herein arise under 42 U.S.C. §1983 and venue is proper in New Mexico pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this district.

5.  Plaintiff Oswaldo Nava is a resident of Roswell, New Mexico.  Prior to September 16, 2025, Plaintiff was employed for approximately six years with the Eastern New Mexico University, Roswell campus ("ENMU-Roswell"), and had an excellent work record.

6. Defendant Shawn Powell was, at all times material hereto, the President of ENMU-Roswell and acted under color of law.  He is sued in his individual capacity.

7.  Defendant James Johnston was, at all times material hereto, the President/Chancellor of EMNU and acted under color of law.  He is sued in his individual capacity.

2

8. Defendant W. Anthony Major, Jr. was, at all times material hereto, the Vice-President for Administration and Finance for EMNU and acted under color of law. He is sued in his individual capacity.

9. Defendant Benito Gonzales was, at all times material hereto, the Executive Director of Human Resources for EMNU and acted under color of law. He is sued in his individual capacity.

10. Defendant Stephanie Miles was, at all times material hereto, the Director of Human Resources for EMNU-Roswell and acted under color of law. She is sued in her individual capacity.

11. Defendant Martha Staab was, at all times material hereto, Director of Marketing and Public Relations and acted under color of law. She is sued in her individual capacity.

12. Defendant Eric Mann was, at all times material hereto, a high-ranking official at EMNU and acted under color of law. He is sued in his individual capacity.

13. Each of the above-named ENMU officials is believed to have participated in the decisions at issue herein.

### III. The Historical Background.

14. Plaintiff attended school at ENMU-Roswell and received an Associate Degree in Criminal Justice in 2020. ENMU-Roswell is a branch of Eastern New Mexico University, which is a New Mexico public university, with its main campus in Portales, New Mexico. While still attending ENMU-Roswell, Plaintiff interned with the Security Department there. In 2019, Plaintiff finished his internship and ENMU then hired him as a part-time security guard while he completed his degree. After two or three months, Plaintiff was promoted by ENMU to a full-time security position. During his employment, Plaintiff received good job performance evaluations every year and received repeated salary raises as a result of his good work. He successfully completed his probationary period and, as of September 16, 2025, Plaintiff was employed at ENMU for about six years. At no time during his employment at ENMU was Plaintiff subjected to disciplinary

action of any sort.

15. Charlie Kirk was a nationally known public figure and organizer for the Republican Party.  Mr. Kirk was a polarizing figure who made provocative statements, *inter alia*, about African-Americans, Mexicans and other immigrants, often claiming that minority citizens were being brought into the United States to replace white citizens as a majority in the country, disparaging gay people, and often opposing gun control laws. Some of his comments included the following:

"If I'm dealing with somebody in customer service who's a moronic Black woman, I wonder is she there because of her excellence, or is she there because of affirmative action?"

"Reject feminism. Submit to your husband, Taylor [Swift]. You're not in charge."

"Islam is the sword the left is using to slit the throat of America."

"We need to have a Nuremberg-style trial for every gender-affirming clinic doctor. We need it immediately."

"I think it's worth it to have a cost of, unfortunately, some gun deaths every single year so that we can have the second amendment to protect our other God-given rights. That is a prudent deal. It is rational."

"I can't stand the word empathy, actually. I think empathy is a made-up, new-age term that does a lot of damage."[1]

Haitians in Alabama "are raping your women and hunting you down at night."

16.  On September 10, 2025, Charlie Kirk was shot and killed while speaking at an event at Utah Valley University.  Some Conservatives and those further to the right on the political spectrum mourned his death, some even advocating civil war against Democrats in retaliation. Those who held opposing political views to Mr. Kirk held a very different view of him and saw him as a man who caused harm and danger with his rhetoric.

---

1  Chris Stein, "Charlie Kirk in His Own Words: Prowling Blacks and the Great Replacement Strategy". The Guardian (Sept. 11, 2025), https://www.theguardian.com/us-news/2025/sep/11/charlie-kirk-quotes-beliefs.

17. Social media is often used to express political ideas and opinions which are highly protected by the First Amendment.  After the shooting, thousands of people expressed their views about Mr. Kirk on social media sites.  This included speech that was critical of Mr. Kirk or that expressed indifference or insensitivity to his passing.  Soon after, supporters of Mr. Kirk initiated a nation-wide, coordinated effort to identify, expose, and "dox" individuals who criticized Mr. Kirk and/or his ideas after his death.  Just hours after Mr. Kirk's death on September 10, 2025, a website entitled "Expose Charlie's Murderers" and later rebranded as the "Charlie Kirk Data Foundation" surfaced online. The website promised to unmask and punish critics of Mr. Kirk and "reshape the rank-and-file of America's institutions."  It crowd-sourced information about those who allegedly spoke out against Mr. Kirk and listed their personal information, including names, email addresses, places of employment and phone numbers.

18.  Almost immediately after the shooting, senior officials in the Trump administration, local Republican lawmakers, and "influencers" allied with them mobilized to enforce the administration's views and retaliate against persons who had expressed views on social media that were deemed to be politically opposed to their views of and feelings about Mr. Kirk.  Among other statements, on September 15, 2025, Vice-President Vance urged supporters of Mr. Kirk to inflict consequences on such persons, stating, *inter alia*: "Call them out, and, hell, call their employer."

19.  As part of this nation-wide organized campaign to punish critics, the Federal Communications Commission Chairman openly and successfully pressured ABC News to silence and suspend talk show host Jimmy Kimmel following a monologue in which Mr. Kimmel suggested that the person who killed Mr. Kirk hailed from the political right.

20. Within a short time after the shooting of Mr. Kirk became public knowledge, right-wing social media influencers mobilized to try to punish persons who had the temerity to make statements they viewed as critical of Mr. Kirk or insensitive to his death.  As noted above, these

5

persons organized campaigns on social media to identify and compile posts by public employees that were critical of Mr. Kirk or that did not demonstrate sufficient sorrow over his death. Efforts were undertaken to have supporters around the country write and call public and private employers and pressure them to discipline these employees.  Many of these posts calling for action to punish those not showing support for Mr. Kirk were then reposted and demonized by political leaders who called for the employees to be terminated.  On or about September 10, 2025, Scott Presler, an influencer and Republican Party activist believed to have been located in Pennsylvania or Florida, urged his followers to seek retribution against these employees, telling them, *inter alia*: "Internet, do your thing" and "You bet your behind we will make them infamous." After September 10, 2025, Presler continually reposted statements made by employees that he believed evidenced a negative attitude toward Mr. Kirk and his work, urging retaliation by getting them fired from their jobs.

### IV.  Plaintiff's Facebook Posting.

21.  Plaintiff had a personal Facebook account.  His account was not connected with his work in any way.

22. Plaintiff thought his account was a private account that could be viewed only by "friends", and he used the account to repost political commentary and sometimes to post his own comments about political matters that were of concern to the public and to himself. Additionally, from time-to-time Plaintiff had discussions with his supervisor, Brad McFadin, and with Defendant Miles about political subjects.  Consequently, both knew that Plaintiff opposed the policies of President Trump.  Defendant Miles and McFadin did not agree with Plaintiff's views.

23.  Plaintiff had seen many media clips of Mr. Kirk and was offended by the disparaging comments he made about gay people and other people.  He was extremely disturbed by the repeated mass shootings that had occurred throughout the country and was offended by Mr. Kirk's

position that such shooting deaths were an unfortunate but acceptable price for society to pay to ensure gun rights.  Plaintiff was particularly upset about the fact that many supporters of Mr. Kirk had not gotten upset about the mass shootings of school children, but were up in arms over his shooting death.

24.  On September 13, 2025, Plaintiff posted a statement on his private Facebook page regarding Charlie Kirk's death.  The post was very brief and read: "I woke up today and guess who didn't??? Charlie Kirk, lol."

25.  Plaintiff reacted as he did for the reasons described in paragraph 23, above. While the post was insensitive and undoubtedly offended some, it did not threaten to harm anyone or advocate any type of violence or revenge, did not commit any type of crime, and did not seek to have others do so.  Plaintiff was speaking as a private citizen on a private platform, not as a public employee, and not on a matter that was related to his employment.  His private Facebook post was speech about a matter of public concern -- the death of a controversial, well-known public figure. The posting was Plaintiff's exercise of his protected First Amendment right to freedom of speech.

**V.  The Concerted and Successful Effort to Get Defendants to Punish Plaintiff for his Protected Speech.**

26.  On or about September 25, 2025, someone, whose identity is not known to Plaintiff, sent (reposted) Plaintiff's post to Scott Presler.  On September 15, 2025, Presler, who had approximately 3,000,000 followers on Twitter, Truth Social, Facebook and Instagram combined, then re-posted Plaintiff's statement on Facebook and possibly other social media sites, including Twitter.  Mr. Presler's reposting stated, *inter alia*: "Meet Oswaldo Nava" and urged action be taken to remove Plaintiff from his position of employment.  In furtherance of this goal, Mr. Presler posted Plaintiff's cellphone number and his email address.

27.  Numerous people who follow Mr. Presler immediately began posting social media statements about Plaintiff that were harassing and threatening.  In fact, Plaintiff received at least

100 such Facebook postings as well as about 20 calls/text messages on his cell phone. Numerous persons, all or most of whom were from outside the ENMU-Roswell community and even from outside New Mexico, heeding Mr. Presler, began to call, text message and otherwise pressure Defendants to remove Plaintiff from his employment.

28. After being subjected to harassment and threats, on the morning of September 16, 2025, Plaintiff deleted his Facebook post about Charlie Kirk. Plaintiff also called his supervisor, Mr. McFadin, to inform him of the calls and postings he had received and that he was being "doxed". Mr. McFadin did not answer the call. Unbeknownst to Plaintiff, Mr. McFadin was in a meeting with Defendants regarding Plaintiff's Facebook post about Mr. Kirk. In addition to Mr. McFadin, the persons who were physically present at the meeting are believed to have been Defendants Powell, Miles, Mann, and Staab. Defendants Johnson, Gonzales, and Major are believed to have participated in the meeting remotely.

29. EMNU-Roswell had no policy regulating the use of social media by employees as of September 13, 2025. EMNU had no policy that identified, defined or provided any guidance to employees on the use of social media or to otherwise ensure that the due process and free speech rights of security guards like Plaintiff and other employees are protected. Nor had Plaintiff's speech violated any law, any regulation in the EMNU Code of Conduct, or policy of the school. However, at the meeting described in the preceding paragraph Defendants decided to immediately remove Plaintiff from his position of employment because of the single comment he posted on Facebook on September 13, 2025.

30. Defendants acted to punish Plaintiff for his protected speech as a result of the coordinated political campaign against Plaintiff because of the content of his statement led by persons outside New Mexico and/or because of their own political bias in favor of Mr. Kirk and against any perceived criticism of him.

31. After Defendants' September 16 meeting, Mr. McFadin called Plaintiff and told Plaintiff that he had been placed on administrative leave and ordered him to turn in all his security equipment and property to Mr. McFadin immediately.

32. Right after this call, Plaintiff arrived at the security office and met with Mr. McFadin. McFadin said "obviously you know why I called you in here. We're going to put you on Administrative Leave." Plaintiff did not know and asked why this was being done to him. McFadin told him that the decision was made because of Plaintiff's statement about Mr. Kirk. He asked Plaintiff if he had, in fact, written the statement and if he felt that way. Plaintiff said that he had written it and that it expressed his beliefs about Mr. Kirk. Mr. McFadin told Plaintiff he would investigate what Plaintiff had done.

33. Plaintiff asked Mr. McFadin what he was going to "investigate," since Plaintiff admitted he had written the Facebook post and had now removed it from his social media. McFadin responded that he did not know and again asked Plaintiff if he had written the post and whether he had deleted it. Plaintiff answered "yes" to both questions.

34. McFadin told Plaintiff that Defendants were getting too many calls complaining about Plaintiff's post about Charlie Kirk. He made it clear to Plaintiff that these callers told Defendants they did not think Plaintiff should be employed as a security guard because of his statement.

35. Plaintiff asked Mr. McFadin what he thought Plaintiff should do. Mr. McFadin informed Plaintiff that the situation was "not looking good" for him. Rather than provide any support for Plaintiff, Mr. McFadin told Plaintiff to "do what's best for you, your family and everyone around you."

36. Plaintiff was faced with and understood the following circumstances: 1) there was a nationwide campaign to purge public employees from their employment for speech unsympathetic to or critical of Charlie Kirk; 2) Defendants had convened a meeting among all the high-ranking

ENMU officials, not only from the Roswell campus but also from the Portales campus; 3) Plaintiff's supervisor had attended the meeting and told Plaintiff he had been placed on administrative leave as a result of his Facebook posting and that "it did not look good" for Plaintiff's continued employment; 4) the letter given to Plaintiff stated he had been put on administrative leave because he was under investigation for violating a law or an ENMU policy, but Plaintiff knew there was no social media policy prohibiting his posting and that his speech had not violated any law or ENMU policy; 5) under ENMU-Roswell policies, the fact that Plaintiff was "immediately" removed from his job meant that the administration had already determined that the "situation" was urgent or serious, a fact amplified by the involvement of the highest ranking officials from Portales; 6) he knew Defendants' claim that he was on administrative leave pending an investigation was a pretextual prelude to his termination intended to pressure him to resign;  7) he knew that the Defendants' claim to need to investigate what he had done was a pretext since he admitted to the speech and thus there was nothing else to "investigate;" 8) Mr. McFadin, his long-time supervisor and friend, did not provide any support for Plaintiff but instead told Plaintiff to do what was best for him and his family; and 9) Plaintiff knew that none of the employees he knew about who had been placed on administrative leave had returned to work.

37.    Plaintiff knew his job was in jeopardy and understood from all the surrounding circumstances that if he did not resign, he would be terminated.   Plaintiff also knew that having an involuntary termination on his employment record would jeopardize his future employment opportunities.    Under these circumstances, Plaintiff's subsequent resignation constituted a constructive discharge.

38. On September 16, 2025, Defendant Powell spoke with the Roswell Daily Record about Plaintiff.  Defendant stated that Oswaldo Nava had made "a negative social media post" regarding the death of Charlie Kirk.  He further stated that the matter was brought to his attention that

morning as a result of phone calls, emails, social media comments and voice messages about Plaintiff's speech.  Defendant Powell stated that the "safety and security of students, faculty and staff are our top priority" and strongly and falsely suggested that ending Plaintiff's employment was necessary to having "a safe learning environment" on the campus.  On the basis of Defendant's statement, the Daily Record headline of the story read: "ENMU Security Guard Fired Over Insensitive Charlie Kirk Post".

## VI.    CAUSES OF ACTION

### <u>Count I: 42 U.S.C. § 1983</u>

**The Decision to Place Plaintiff on Administrative Leave and Immediately Remove Him from Employment Violated Plaintiff's Right to Free Speech Under the First and Fourteenth Amendments to the U.S. Constitution**

39.  Plaintiff's speech was not made pursuant to his official duties and was about a matter of public concern.

40.  Defendants' interest as Plaintiff's employer in promoting the efficiency of the ENMU-Roswell Security Department services did not outweigh Plaintiff's free speech interests.  Rather, Defendants allowed external pressure from sources who were not on campus and who did not know Plaintiff, the nature of his work, the department he worked for, nor Plaintiff's work history and who did not care about any of those factors to govern their decision to remove Plaintiff from his work.

41. Plaintiff's speech was a substantial or motivating factor in the decision to remove Plaintiff from his employment by placing him on administrative leave and in his constructive discharge.  Indeed, it was the sole factor.

42. Defendants acted willfully, intentionally and/or with deliberate indifference toward Plaintiff and his clearly established federal constitutional rights.

11

## Count II: 42 U.S.C. §1983

**Plaintiff Was Subjected to a Constructive Discharge In Violation of His Right to Free Speech Under the First and Fourteenth Amendment to the United States Constitution.**

43. Under the totality of the circumstances communicated to Plaintiff by his employer and those known to Plaintiff on September 16, 2025, a reasonable employee in Plaintiff's position would have understood that he was going to be terminated for his speech. Plaintiff understood he was going to be terminated for his speech.

44. Defendants communicated sufficient facts about Plaintiff's employment situation that would have compelled a reasonable employee to resign rather than face termination and was essentially the same as if Defendants told Plaintiff he could either resign or he would be fired.

### VII. Damages.

45. As a direct and proximate result of Defendants' acts and omissions, Plaintiff suffered and continues to suffer severe emotional distress, anxiety, humiliation, embarrassment, loss of past income, loss of future income, and the violation of his federal constitutional rights.

46. At all times material hereto, each of the Defendants acted intentionally, willfully, with deliberate indifference, and/or with malice toward the protected speech rights of Plaintiff. For this reason, Plaintiff is entitled to an award of punitive damages against each Defendant under 42 U.S.C. §1983.

### VIII.  Prayer for Relief.

WHEREFORE, Plaintiff prays for the following relief:

1.  For compensatory damages in an amount to be determined by the trier of fact;

2.  For punitive damages against Defendants in an amount to be determined by the trier of fact;

3.  For pre and post judgment interest;

4.  For reasonable attorney's fees and costs under 42 U.S.C. §1988.

5.      For such other and further relief as the court deems just and proper.


                              Respectfully Submitted

                               /s/  RICHARD ROSENSTOCK
                              Richard Rosenstock
                              1121 Paseo de Peralta
                              Santa Fe, New Mexico 87501
                              505-988-5324
                              richard.rosenstock@gmail.com


                               /s/ DANIEL YOHALEM
                              Daniel Yohalem
                              1232 Vallecita Drive
                              Santa Fe, New Mexico 87501
                              505-690-2193
                              daniel.yohalem@gmail.com

                              Attorneys for Plaintiff

13